# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| BRUCE FALCONER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 05-42-B-W |
| | ) | |
| PENN MARITIME, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## AMENDED ORDER ON DEFENDANT'S MOTION IN LIMINE TO BAR PLAINTIFF'S CLAIM OF SIU LIEN

Arguing that Mr. Falconer is not entitled to a double recovery, Penn Maritime, Inc. (Penn Maritime) moves to bar evidence that Bruce Falconer has incurred past medical expenses, because Penn Maritime either voluntarily paid the medical bills or voluntarily paid for medical insurance, which has paid the bills. *Def.'s Mot.* at 1, 2 (Docket # 100). In response, relying on *DeMedeiros v. Koehring Co.,* 709 F.2d 734 (1st Cir. 1983), Mr. Falconer argues that since the health insurer has a lien on any judgment, he should be allowed to introduce evidence of past medical expenses to avoid a double deduction. *Pl.'s Opp'n.* at 2 (Docket # 101).

Based on the evidence, this Court finds that Penn Maritime itself paid all Mr. Falconer's causally related medical bills from July 30, 2000 to January 2003 and that Penn Maritime voluntarily paid for medical insurance benefits for Mr. Falconer from January 2003 to date. Consequently, this Court concludes that Mr. Falconer cannot claim a loss for medical expenses that Penn Maritime has either directly paid or secured the payment of through the purchase of medical insurance.

## I.        Background

Bruce Falconer and Penn Maritime are currently litigating a Jones Act and unseaworthiness claim before a jury in this Court, concerning a serious injury Mr. Falconer sustained while working as a seaman aboard Penn Maritime's vessel, the TUG VALIANT, on July 30, 2000.  The trial began on November 1, 2005 and is ongoing. Bruce Falconer was the first witness and during cross-examination on November 3, 2005, defense counsel elicited an admission that Penn Maritime had made direct payments of his medical bills and has continued to make contributions to his union's medical plan, which has paid his remaining medical expenses.[1]

Prior to trial, the Court ruled on three motions in limine, touching on this issue: (1) Plaintiff's receipt of maintenance and cure benefits; (2) Plaintiff's receipt of Social Security Disability Income (SSDI) and Medicare benefits; and, (3) Plaintiff's receipt of advancements from Defendant.  *Order Denying Pl.'s Mot. in Limine Regarding Maintenance and Cure Payments, Granting Pl.'s Mot. in Limine Regarding Pl.'s Receipt of SSDI and Medicare Benefits and Denying a Portion of Def.'s Mot. in Limine, and Granting Pl.'s Mot. in Limine to Exclude Expert Testimony on the Issue of Liability* (Docket # 94)(First Order); *Order Granting Pl.'s Mot. in Limine Regarding Penn Maritime's Three Employees, Granting in Part and Denying in Part Pl.'s Mot. Regarding Monetary Advances, and Denying Pl.'s Mot. Regarding Dr. Rapoport* (Docket #

---

[1] Q. In addition, Penn Maritime, as you know, continued to make contributions on your behalf to your union's medical and welfare plan, right?
 A.  I believe so.
 Q. And that continues even today, right?
 A.  As far as I know.
 Q. And it's what pays your medical expenses and has, together with earlier direct payments from Penn Maritime, right?
 A.  As far as I know.
*Transcript* at 142-43, lines 24-8.

95)(Second Order).  Regarding the maintenance and cure issue, this Court ruled that Penn Maritime's prior payments were admissible because its payments after maximum medical improvement could be prepayments and the parties had not agreed on the date of maximum medical improvement.  *First Order* at 3.  This Court ruled inadmissible evidence of Mr. Falconer's receipt of SSDI and Medicare benefits.  *Id.* at 4-7.  Finally, this Court allowed Penn Maritime to introduce evidence of prior Penn Maritime advances, but did not allow a set off from any jury award.  *Second Order* at 5-6.

In light of these rulings, when Penn Maritime elicited Mr. Falconer's admissions about its payment of medical bills and insurance premiums, the Court questioned whether the evidence contravened its rulings.[2]  *Transcript* (11-03-05) at 180-85, lines 1-20; (11-4-05) at 2-20, lines 3-10.  The Court orally ordered counsel to file legal memoranda on the issue.  *Transcript* (11-4-05) at 12-13, lines 18-3.  On November 6, 2005, the parties filed memoranda; however, it became apparent there was no agreement on the evidentiary foundation for the Court's ruling and on November 10, 2005, the parties took the deposition of James P. Sweeney, Vice President of Operations for Penn Maritime, to supply the foundation.

## II.    The Facts

Penn Maritime employed Bruce Falconer beginning July 1998, when it purchased the TUG VALIANT.  *James Sweeney Dep.* at 5 (November 10, 2005).  Throughout his employment, Mr. Falconer has been a member of the Seafarers International Union (SIU), which has a medical benefits plan, called the Seafarers Health and Benefit Plan

---

[2] In ruling on social security and Medicare benefits, this Court made passing reference to payments under the union health plan.  *See First Order* at 5.  However, this Order was based on Plaintiff's contention that the union health insurer has an enforceable lien against any judgment, an assertion that upon further analysis is incorrect.

(SHBP), covering eligible seamen.  Whether a seaman is eligible is controlled by the terms and conditions of a collective bargaining agreement between Penn Maritime and SIU.  *See id.* at 5-7.  To be entitled to employer-paid medical coverage, a seaman must first have 125 days of sea time in the prior year; in Mr. Falconer's case, he had sufficient sea time in 1999 and was eligible for Penn Maritime's payment of medical insurance as of July 30, 2000.  *Id.* at 5-6.  In addition, however, the seaman must have at least one sea day during the six months prior to the date the medical expense is incurred.  *Id.* at 7.  Mr. Falconer's last sea day was July 30, 2000, the date of his accident, and, if Penn Maritime had not made further payments after July 30, 2000, his right to have Penn Maritime pay for SHBP coverage would have expired on January 31, 2001.  *Id.* at 6-7.

After Mr. Falconer's accident, Penn Maritime was under no contractual obligation to make any further payments to SHBP on behalf of Mr. Falconer.  *Id.* at 7-8.  Its contributions on his behalf to the SHBP were entirely voluntary and not a fringe benefit. *Id.*  at 7-8, 13.  Even though it had no obligation to do so, Penn Maritime continued to maintain medical insurance coverage for Mr. Falconer through SHBP and those payments have continued to date.  *Id.* at 8-9.  Penn Maritime is under no obligation, however, to make any ongoing payments to SHBP for Mr. Falconer and may stop doing so at any time at its discretion.  *Id.* at 24.

As it turns out, from July 30, 2000 to January 2003, as a result of an administrative error, Penn Maritime itself actually paid for Mr. Falconer's medical expenses and did not submit them to SHBP.  *Id.* at 8, 14-15.  From some time in January 2003 onward, after it

caught the error, Penn Maritime has submitted Mr. Falconer's medical bills to SHBP for payment and SHBP has paid them.[3]  *Id.* at 8.

The SHBP policy has the following reimbursement provision:

> The Plan may not pay benefits if your illness or injury is due to the actions of someone else who can be held legally responsible.  You can receive benefits only if you agree to assign payment to the Plan from any money you recover.  You must notify the Plan of payments you receive as a result of a lawsuit or settlement.  If you recover a sufficient amount to repay the Plan for all or some of the benefits paid, and you do not reimburse the Plan, the Plan may then deduct the amount you owe from your future benefits. [4]

To Mr. Sweeney's knowledge, SIU has never sought reimbursement under this provision from Penn Maritime.  *Id.* at 22.  He explained that Penn Maritime is the entity paying the SHBP premium and its loss experience is negotiated in its level of payment.  *Id.* at 21.  In addition, Audrey Feffer, Associate Counsel of the SIU, has written a letter dated November 9, 2005, which reads:

> Please be advised that at the present time, the [SHBP] does *not* hold a lien in the amount of medical benefits paid on behalf of a participant if the injuries for which benefits are paid arose from a shipboard injury.  However, if the individual applied for Sickness and Accident Benefits (disability benefits in the amount of $25.00 per day) because he or she was denied Maintenance and Cure from the Employer, then the Plan would hold a subrogation interest in the amount of any future recovery of Maintenance and Cure payments.

*Id.* at 23.[5]

### III.    Discussion

#### A.  Collateral Source Rule

##### 1.  General Principles

---

[3] Plaintiff's counsel has indicated that since January 2003 SHBP has paid approximately $120,000.00 in medical bills.
[4] This language is taken from Mr. Falconer's Opposition Memorandum and has not been formally submitted into evidence; however, it does not appear to be a matter of dispute.  *Pl.'s Opp'n* at 1.
[5] There is no evidence Mr. Falconer applied for the $25.00 per day disability benefit from SHBP.  *Id.* at 23.

To begin with the basics, an injured person is entitled to be made whole from injuries or losses proximately caused by the defendant and Mr. Falconer bears the burden of proving he has sustained losses causally connected to the Penn Maritime's negligence or the unseaworthiness of its vessel.  In the typical personal injury case, the injured party's losses are initially paid either by the plaintiff himself or by third-party sources unconnected to the defendant.  The collateral source rule, as its name implies, applies where the plaintiff has received a benefit from a source collateral to the tortfeasor and it allows the plaintiff to claim such benefits.  The rationale for the rule is that "either the injured party or the tortfeasor is going to receive a windfall, if a part of the pecuniary loss is paid for by an outside source and that it is more just that the windfall should inure to the benefit of the injured party than that it should accrue to the tortfeasor." *Werner v. Lane*, 393 A.2d 1329, 1335-36 (Me. 1978)(quoting *Olivas v. United States*, 506 F.2d 1158, 1163-64 (9th Cir. 1974)(citation omitted)); *McGrath v. CONRAIL,* 136 F.3d 838, 840 (1st Cir. 1998)("Under the collateral source rule, the plaintiff need not offset his or her recovery from the defendant by the amount of any benefits received <u>from a source collateral to the defendant</u>.")(emphasis supplied); *Moulton v. Rival Co.,* 116 F.3d 22, 27 (1st Cir. 1997).

It is sometimes the case, however, that the source of payment is the defendant.  In such cases, the collateral source rule usually does not apply.  "Under those circumstances no one gets a windfall and if a recovery were allowed under those circumstances the result would be that the plaintiff would receive a double recovery and that the defendant would be mulcted twice for the same item of damages." *Werner,* 393 A.2d at 1336.

However, this general rule has to be qualified.  If the employer made the payment because it was obligated to do so, the collateral source rule may apply.

In *Folkestad v. Burlington N., Inc.,* 813 F.2d 1377 (9th Cir. 1987), the Ninth Circuit analyzed a FELA action in which an employee's medical expenses were paid by a health and welfare plan administered through a third-party insurance company.  Finding the plan was financed wholly by premiums paid by the railroads (including Burlington Northern), the Court noted that "the tortfeasor's liability generally may not be reduced by payments which the injured party received from insurance unless the insurance was procured by the tortfeasor.  Where, however, the tortfeasor voluntarily procures the insurance, the collateral source rule does not apply and setoff is generally permitted." *Id.* at 1380.  Therefore, the Court concluded that "the common law principle would appear to allow setoff, once it is established that premiums were paid by the employer".  *Id.* at 1381.

*Folkestad*, however, found that FELA complicated the issue:

> "The problem that has troubled the courts has been whether to treat the insurance as a fringe benefit in part compensation for the employee's work. If it is viewed as the product of the employee's labors, it is deemed to come from a source collateral to the employer/tortfeasor rather than from the employer/tortfeasor itself. Setoff would permit avoidance of FELA liability, and such avoidance is prohibited by section 5. If, on the other hand, the insurance is viewed as a contribution by the employer intended to fulfill FELA obligations, it would appear to fall within the proviso, and setoff should be permitted.
>
> In dealing with this issue both in the railroad and maritime cases, courts have been virtually unanimous in their refusal to make the source of the premiums the determinative factor in deciding whether the benefits should be regarded as emanating from the employer or from a 'collateral source'.  Rather, courts have tried to look to 'the purpose and nature of the fund and of the payments' and not merely at their source'."

*Id.* (citations omitted); *Haughton v. Blackships, Inc.,* 462 F.2d 788, 790 (5th Cir. 1972)(in a maritime case, "application of the collateral source rule depends less upon the source of funds than upon the character of the benefits received")[6].

The answer depends, then, on the "character of benefits received" in this case. *Haughton* elaborates by drawing a policy distinction between an employer-tortfeasor who voluntarily undertakes to indemnify against liability by payment into a fund for that purpose (in which case the employer should not be penalized by permitting the Plaintiff a double recovery) and the employer-tortfeasor who makes a payment directly or indirectly into a fund established for an independent reason, or where such payment by the employer should be considered in the nature of a fringe benefit or deferred compensation. *Id.* at 791.[7]

In analyzing this issue, the Fifth Circuit in *Haughton* found "particularly helpful" the case of *Hall v Minnesota Transfer Ry. Co.,* 322 F. Supp. 92 (D. Minn. 1971). In *Hall,* the District Court reviewed the collective bargaining contract between the employee group and the employer and found that "this policy [that the employer pay the premiums] is, in short, a fringe benefit given in part consideration for the employer's services. It is in no sense a mere gratuity nor an arrangement by which the company has undertaken voluntarily to indemnify itself against possible liabilities". *Id.* at 96.

The District of Maine adopted a similar approach. *See Allen v. Exxon Shipping Co.,* 639 F. Supp. 1545, 1547-48 (D. Me. 1986)("The parties ultimately agree that the

---

[6] In enacting the Jones Act, Congress adopted the provisions of FELA. *See* 46 App. U.S.C.A. § 688; *Miles v. Apex Marine,* 498 U.S. 19, 32-33 (1990). Consequently, cases dealing with FELA are applicable in this context.

[7] *Haughton's* approach has been adopted in a number of Circuits in FELA and Jones Act cases. *See Blake v. Delaware & H. Ry. Co.,* 484 F.2d 204 (2d Cir. 1973), *disapproved on other grounds as stated in Flanigan v. Burlington N., Inc.,* 632 F.2d 880 (8th Cir. 1980); *Patterson v. Norfolk & W. R.R. Co.,* 489 F.2d 303 (6th Cir. 1973); *Clark v. Burlington N., Inc.,* 726 F.2d 448 (8th Cir. 1984); *Russo v. Matson Navigation Co.,* 486 F.2d 1018 (9th Cir. 1973).

controlling issue in determining whether or not a set-off of these benefits is legally permissible is the nature and character of the benefit received…It is clear that the general issue to be resolved is whether payment of the benefits is made pursuant to a plan of the employer to provide for its own indemnification or whether the payment is in the nature of a fringe benefit or deferred compensation. *Clark v. Burlington Northern, Inc*., 726 F.2d 448 (8th Cir. 1984)…'The important consideration is the character of the benefits received'"); *Webber v. Int'l Paper Co.,* 307 F. Supp. 2d 119, 124-25 (D. Me. 2004); *see Davis v. Odesco, Inc.,* 18 F.3d 1237, 1243-47 (5th Cir. 1994); *Phillips v. W. Co. of N. Am.,* 953 F.2d 923, 932 (5th Cir. 1992)(applying this test in a Jones Act and unseaworthiness claim).

### 2.  The Collateral Source Rule and Maritime Personal Injury Cases

It is well established that the collateral source rule can be applied in Jones Act cases.[8]   *Tipton v. Socony Mobil Oil Co., Inc.,* 375 U.S. 34, 37 (1963); *Bourque v. Diamond M. Drilling Co.,* 623 F.2d 351, 354 n.2 (5th Cir. 1980); *Brown v. United States,* 615 F. Supp. 391, 399 (D. Mass. 1985), *cause dismissed* 795 F.2d 76 (1st Cir. 1986).  In view of the peculiar circumstances of this case, the application of the *Allen/Webber* analysis is straightforward:  Penn Maritime has voluntarily paid Mr. Falconer's medical bills from July 30, 2000 to date either directly or through its purchase of medical insurance.  The evidence establishes that Penn Maritime, not SHBP, actually made the payments for Mr. Falconer's care from July 30, 2000 to sometime in January 2003 and that it was not obligated to do so.   To the contrary, it made these payments by

---

[8]  The application of the collateral source rule can be tricky if it involves the interweaving of the maintenance and cure obligation and the niceties of a collective bargaining agreement.  This Court does not, however, need to reach this issue, because of the circumstances of this case.

administrative error.  As such, Penn Maritime's payments from July 30, 2000 to January 2003 would not under any theory be subject to the collateral source rule.

The next question is whether the SHBP payments of approximately $120,000.00 in medical benefits from January 2003 to date are subject to the collateral source rule. This Court accepts the unrebutted testimony of Mr. Sweeney that Penn Maritime has not been required to make any contributions to SHBP to fund Mr. Falconer's medical coverage from January 2003 to date.[9]  Because they were funded solely by voluntary premium payments by Penn Maritime, SHBP payments to or on behalf of Mr. Falconer during this time are not subject to the collateral source rule.

The broad reimbursement language in the SHBP policy could be read as giving it a right to require Mr. Falconer assign subrogation rights against Penn Maritime or face a reduction in his future benefits. However, there is no evidence that SHBP has attempted to enforce this contractual provision against either Mr. Falconer or Penn Maritime. SHBP has not required Mr. Falconer to sign an assignment of his rights against Penn Maritime and has not placed him on notice of its intention to reduce his future benefits by the amount of any award he receives from this law suit.  SHBP has not placed Penn Maritime on notice of any lien.

Further, SIU expressly waived its right to assert a lien in its November 9, 2005 letter.  Its waiver is understandable and prudent.  Mr. Falconer is after all a member of SIU and presumably, SHBP is in business to serve its members.  As regards Penn Maritime, although the entire policy has not been placed in evidence, for SIU to seek reimbursement against the entity which paid the premium is analogous to an insurer

---

[9] It is worthy of note that there is no evidence that Mr. Falconer made any individual contributions to his plan. *Cf. Davis v. Odeco*, 18 F.3d 1237, 1245 (5th Cir. 1994).

attempting to subrogate against its own insured, which is contrary to basic insurance principles. *See Lussier v. Runyon,* 50 F.3d 1103, 1110 (1st Cir. 1995), *cert. denied* 516 U.S. 815 (1995)("The fact that the payer of damages and the dispenser of a collateral benefit are one and the same, or that they are linked in some economically meaningful sense, tends to make the deployment of the collateral source rule less attractive."). Finally, since this Court is ruling that SHBP's payments are not an appropriate element of damage, SHBP cannot claim from Mr. Falconer something he will not receive.

**B. *DeMedeiros***

Plaintiff's reliance on *DeMedeiros* is misplaced. *DeMedeiros* involved a products liability case, in which Defendant introduced evidence that the Plaintiff had received worker's compensation disability benefits as a result of the injury. The trial judge gave a limiting instruction that the evidence was admitted solely for the purpose of showing malingering. The First Circuit agreed with the Plaintiff's concern that the jury may have "reduced the plaintiff's award by the amount of the workmen's compensation benefits. This would have been improper since the Massachusetts statute provides, in substance, that an injured employee who recovers in tort from a third party must repay workmen's compensation benefits out of his personal injury award." 709 F.2d at 740. Consequently, though not reversing the trial judge on the sufficiency of the limiting instruction, the Court concluded:

> "We believe…that such an instruction should ordinarily be given when requested, since by reassuring the jury that double payment will not, in fact, occur, it avoids any possible disposition by the jury to reduce the award improperly. There are, to be sure, complexities in the Massachusetts workmen's compensation law which make it unwise for a court to get deeply into this matter; and an inartful explanation could be taken to imply that plaintiff's duty to repay the insurer is some reason for the jury to increase the award. We think it would suffice for the court to instruct tersely that the jury should not deduct workmen's compensation

receipts in computing damages since plaintiff will later be required by law to repay any such receipts from the award."

*Id.* at 741.  Similarly, Plaintiff argues there is a contractual lien in this case, and for that reason as for the reason that Defendant surprised Plaintiff by bringing this issue out on cross-examination, Plaintiff should be entitled to offer evidence as to the lien and repayment obligation in addition to a curative instruction.  *Pl.'s Opp'n.* at 3.

*DeMedeiros* is inapposite.  First, unlike this case, *DeMedeiros* did not involve a suit by an employee against an employer and there was no claim that the defendant supplied the benefit.  Secondly, under Massachusetts law, it is compulsory that an employer provide workers' compensation benefits to employees and there was no claim that it provided the benefits voluntarily.  Mass. Gen Laws ch. 152 § 25A.  Third, *DeMedeiros* relied upon the statutory right the employer or its insurer enjoys under Massachusetts law to recover benefit payments from a tortfeasor.  Mass. Gen. Laws ch.152 § 15; 709 F.2d at 740 ("the Massachusetts statute provides, in substance, that an injured employee who recovers in tort from a *third party* must repay workmen's compensation benefits out of his personal injury award." (emphasis supplied)).  Finally, this Court has found that SIU in this case waived any right to reimbursement it may have had from Penn Maritime.

## IV.    Conclusion

Bruce Falconer may not assert as an element of damage against Penn Maritime medical bills that Penn Maritime has paid either directly or through its voluntary purchase of medical insurance through SIU.  The current record in this case, which reflects that the Plaintiff has not incurred any medical bills to date and that Penn

Maritime has paid those bills, is accurate.  This Court GRANTS Penn Maritime, Inc.'s

Motion in Limine to Bar Plaintiff's Claim of SIU Lien.

**SO ORDERED.**


/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE


Dated this 14th day of November, 2005