## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| BRUCE FALCONER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 05-42-B-W |
| | ) | |
| PENN MARITIME, INC., | ) | |
| | ) | |
| Defendant. | ) | |

### ORDER ON PLAINTIFF'S MOTION FOR A NEW TRIAL

On July 30, 2000, Bruce Falconer, an Assistant Engineer for Penn Maritime, fell into an open hatch on Penn Maritime's tug, the VALIANT, dropped approximately fourteen feet, and sustained a crush injury to his thoracic spine, rendering him paralyzed below his mid-chest. Mr. Falconer filed a Jones Act and unseaworthiness claim against his employer. After a three-week trial, the jury returned a verdict in favor of Mr. Falconer; it assessed a total damage award of $5,062,060.00, reduced by 35% due to Mr. Falconer's own negligence, for a final verdict of $3,290,339.00. *Jury Verdict* (Docket # 116); *Judgment* (Docket # 120). Mr. Falconer moves for a new trial on liability claiming the Court erred in certain evidentiary and other rulings and for a new trial on damages claiming the Jury was too parsimonious in awarding $100,000.00 in pain and suffering damages. This Court denies Mr. Falconer's motion.

### I.     Statement of Facts

On July 30, 2000, Penn Maritime employees Bruce Falconer, Captain Kim Duplantis, and Port Engineer Manuel Carvalheiro, were working together on the Tug VALIANT in

drydock at Tampa, Florida.[1]  That morning, Mr. Falconer resolved to mount a transition piece onto an engine in the lower engine room located below the upper and main decks.[2] To access the lower engine room, hatches at the upper and main decks had to be opened and the transition piece, a relatively large piece of equipment, had to be lowered by crane through the open hatches.

The three men, who were alone on the vessel, opened the hatches by using the crane on the upper deck.  After opening the hatch on the upper deck, they used the crane to lift the cover off the main deck hatch and brought it to the upper deck.  Captain Duplantis noticed the underside of the main deck hatch cover needed painting.  Captain Duplantis decided to paint it while Mr. Falconer and Mr. Carvalheiro attached the transition piece. The main deck hatch cover on the upper deck, a hole approximately 5 feet by 5 feet was left open on the main deck.

As Mr. Falconer and Mr. Carvalheiro began working on moving and securing the transition piece, Captain Duplantis went to the open main deck hatch and began to erect a safety railing around the hole.  The safety railing consisted of stanchions and a rope.  The stanchions were to be fixed in the inside lip of the hatch and once secure, the rope would be strung from stanchion to stanchion, creating a rope railing around the hatch opening.

Captain Duplantis had some difficulty locating the safety rail equipment and as he was erecting the stanchions, Mr. Carvalheiro informed him that the transition piece job would take much less time than the hatch painting job and it made more sense to close

---

[1] This statement of facts does not begin to capture the acrid nature of the relationship between chief opposing counsel:  Ms. Latti and Mr. Anderson for Mr. Falconer and Mr. Stearns for Penn Maritime.  Their personal animosity simply permeated the courtroom.  This was all the more regrettable, given the grievous injuries Mr. Falconer sustained, the significance of the liability issues, and their clients' respective stakes in the outcome.

[2] The witnesses used various terms to describe the decks, but for the sake of simplicity, this Court has used upper deck to describe the highest deck; main deck to describe the deck below the upper deck; and, lower deck to describe the deck below the main deck, where the lower engine room was located.

the hatch.  At that point, Captain Duplantis removed the stanchion or stanchions and began looking for a cable sling and shackles to attach to the hatch cover and reclose the main hatch.  As Captain Duplantis was looking for this equipment near the open hole, Mr. Falconer appeared on the main deck.

Mr. Falconer was carrying a large flat box on top of which was a gasket that he intended to install between the engine and the transition piece.  He held the box and gasket with both hands in front of himself, making a V shape.  Captain Duplantis asked Mr. Falconer where the shackles were located and Mr. Falconer responded and proceeded forward.  As he walked toward the open hatch, Captain Duplantis shouted, "Hatch Open", a standard warning in these circumstances aboard vessels like the Tug VALIANT.

There are two versions of what occurred next.[3]  The first is that after walking close to the open hatch, Mr. Falconer bumped into a doorway, lost his balance, and fell into the hatch opening.  Captain Duplantis recalled that Mr. Falconer walked near the open hatch and turned to enter the engine room doorway.  The captain testified that Mr. Falconer stopped suddenly as if the gasket box had struck the sides of the doorway.  Captain Duplantis described Mr. Falconer moving backwards, dropping the box, and turning as if he had lost his balance.  He said Mr. Falconer appeared to try and grab a part of the hatch opening as he fell into it.  Mr. Falconer's counsel raised a second possibility:  that Mr. Falconer simply walked straight into the open hole.

Mr. Falconer suffered a devastating personal injury.  He sustained a basal skull fracture, a spinal fracture at T6-7, and significant sequelae, including pulmonary

---

[3] This Court is required to view the evidence in a light most favorable to the non-moving party.  *See CMB Constr. Co. v. Weil-McLain,* No. 95-1265, 1995 U.S. App. LEXIS 34212, *3 (1st Cir. Dec. 6, 1995)(unpublished).  It is unclear which version is more favorable to Penn Maritime.

problems, infection, and neuropathic pain.  Although he has use of his arms, he has no feeling below mid-chest and his mid to lower body is permanently paralyzed.  He is permanently confined to a wheelchair.  He required extensive spinal stabilization surgery and faces the possibility of future surgery.  He has experienced a host of problems and faces others, including scoliosis, renal failure, significant bladder and bowel problems, arthritis, shoulder symptoms, and a shortened life expectancy.  He underwent a rigorous course of physical and occupational therapy and continues to require ongoing therapy.  He has undergone psychological counseling.

Mr. Falconer has persevered despite his substantial limitations.  Mr. Falconer comes from a family of high achievement and he is intelligent, having graduated from Maine Maritime Academy in 1984 with a bachelor of science in engineering.  At the time of the accident, he held a license from the United States Coast Guard as a second assistant engineer – steam and diesel.  Before the accident, Mr. Falconer was physically fit and active and he has been unable to continue many of the more strenuous activities, such as mountain climbing and snowshoeing.  He has, however, remained as active as possible.  He has participated in such activities as scuba-diving training, handicapped skiing (water and downhill), hand cycling, snowmobiling, fishing, and boating.  These activities, however, require the active assistance of others and he has been able to do them only rarely.  His daily routine includes two or three hours of exercise with home-exercise equipment.  He has not been as actively involved with his son, Connor.  Before his accident, he played sports with Connor and helped coach his Little League team.  Since his accident, he has been able to go to Connor's games, but occasionally has had difficulty in the absence of handicap facilities.  The injury has had an impact on his

marriage.  His wife, Lee Falconer, has continued to be loving and supportive; however, his injury has affected both him and her, and as a consequence, them.

Regarding special damages, Penn Maritime previously advanced a total of $397,098.00 for such items as a new mortgage-free, wheelchair-accessible home, a wheelchair-accessible van, and home-exercise equipment as well as advanced lost wages in the amount of $82,503.00.  The parties ultimately agreed that Mr. Falconer's medical bills had been paid to date and were not an element of damage.  Before reduction for comparative negligence, the $5,062,060.00 Jury award is as follows:  (1) net past lost wages:  $255,497.00; (2) past pain and suffering:  $25,000.00; (3) future lost earning capacity:  $2,115,668.00; (4) future medical costs:  $2,590,895.00; and, (5) future pain and suffering:  $75,000.00.  *Jury Verdict.*

## II.      Standard of Review

Under Rule 59, the trial court has discretion to grant a motion for a new trial in a jury-tried case "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States".  Fed. R. Civ. P. 59(a).  The First Circuit has limited the exercise of discretion to situations where "the verdict is against the weight of the evidence, the damages are excessive, or…for other reasons, the trial was not fair to the party moving…."  *Rivera Castillo v. Autokirey, Inc.,* 379 F.3d 4, 13 (1st Cir. 2004)(citations omitted).  The motion may "raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury".  *Cigna Fire Underwriters Co. v. Macdonald & Johnson,* 86 F.3d 1260, 1262-63 (1st Cir. 1996)(quoting *Montgomery Ward & Co. v. Duncan,* 311 U.S. 243, 251 (1940)).  However, the First Circuit has cautioned that a district court may set aside a jury's verdict

and order a new trial "only if the verdict is so clearly against the weight of evidence as to amount to a manifest miscarriage of justice". *Autokirey,* 379 F.3d at 13 (citation omitted).

### III.   New Trial on Damages:  Pain and Suffering

Mr. Falconer strenuously argues that the $100,000 award for pain and suffering is "miserly", "shocking to the conscience", and "inconsistent with…[the] award of $4,706,563.00 for future medical costs and future lost earning capacity." *Pl.'s Mot. for a New Trial* at 1 (Docket # 121)(*Pl.'s Mot.*).  Plaintiff contends this award "was clearly against the weight of evidence" and was "unconscionable and a 'manifest injustice' that is far 'outside the universe of possible awards.'"  *Pl.'s Mot.* at 2, 6 (citing *Milone v. Moceri Family, Inc.*, 847 F.2d 35, 37 (1st Cir. 1988); *Phav v. Trueblood, Inc.,* 915 F.2d 764, 766 (1st Cir. 1990)).

The First Circuit has noted that it has "consistently declined to play Monday morning quarterback in reviewing a jury's assessment of damages."  *Segal v. Gilbert Color Sys., Inc.*, 746 F.2d 78, 80 (1st Cir. 1984).  Although "an inadequate damages award may constitute sufficient reason for a new trial", *Phav*, 915 F.2d at 766, the First Circuit has emphasized the weighty burden on the moving party.  A verdict may be set aside and new trial ordered "when the verdict is against the clear weight of the evidence, or is based upon evidence which is false, or will result in a clear miscarriage of justice." *Id.* (citations omitted).

When reviewing an award for damages, "the district court is obliged to review the evidence in the light most favorable to the prevailing party and to grant…a new trial on damages only when the award 'exceeds any rational appraisal or estimate of the damages

that could be based on the evidence before it'". *E. Mountain Platform Tennis, Inc. v. Sherwin-Williams Co.,* 40 F.3d 492, 502 (1st Cir. 1994)(citation omitted). *See also Smith v. Kmart Corp.,* 177 F.3d 19, 30 (1st Cir. 1999)("Translating legal damage into money damages is a matter 'peculiarly within a jury's ken,' especially in cases involving intangible, non-economic losses")(citations omitted); *Brown v. Freedman Baking Co.,* 810 F.2d 6, 11 (1st Cir. 1987)("We rarely will override the jury's judgment on the appropriate amount of damages to be awarded").

The trial judge is given "broad latitude" to review jury awards asserted to be inadequate, for "he has both seen the witnesses and heard the testimony and is in the best position to determine whether the verdict is against the great weight of the evidence". *Sprague v. Boston & Maine Corp.,* 769 F.2d 26, 28 (1st Cir. 1985). *See also Whitfield v. Melendez-Rivera,* 431 F.3d 1, 16 (1st Cir. 2005)(noting that the "paramount focus in reviewing the damage award must be the evidence presented at trial")(citing *Gutierrez-Rodriguez v. Cartagena,* 882 F.2d 553, 579 (1st Cir. 1989)). While the jury "is free to run the whole gamut of euphonious notes – to harmonize the verdict at the highest or lowest points for which there is a sound evidentiary predicate" if the trial judge finds that the "end result…violate[s] the conscience of the court or strike[s] such a dissonant chord that justice would be denied were the judgment permitted to stand", he should invalidate the verdict. *Milone,* 847 F.2d at 37.[4]

The First Circuit distinguishes between two types of damage awards challenged for impropriety: those that "allegedly fail[ ] to bear any rational relationship to the evidence of the damages presented at trial" and those "where there is some evidence of an

---

[4] *Milone* affirmed a rejection of a new trial when plaintiff, who injured his knee, was awarded $29,000 for lost wages on a Jones Act claim, but nothing for pain and suffering or other noneconomic losses. *Id.* at 38, 41.

improper verdict based on factors other than the amount of the damage award." *Gil-De-Rebollo v. Miami Heat Ass'ns*, 137 F.3d 56, 62 (1st Cir. 1998). If the allegation of impropriety is based solely on the amount of the damage award, the "circumstances under which a trial court may overturn a verdict are more limited." *Id.* By contrast, if the allegation is based on matters outside the amount of the award itself, such as inconsistent jury responses to special interrogatories, the trial court's discretion "is broader." *Id.*

### a. Comparative Case Law

The First Circuit has directed that the "paramount focus in reviewing a damage award must be the evidence presented at trial." *Gutierrez-Rodriguez,* 882 F.2d at 579. Although *Gutierrez-Rodriguez* rejected the contention that "comparisons are never of value", the First Circuit has cautioned that the "value of any comparison will depend upon the similarities of the injuries, the locations and dates of the trials, and of the evidence presented therein" and noted that "we cannot image overturning a jury award that has substantial basis in the evidence presented at trial merely because the amount of the award is somewhat out of line with other cases of a similar nature." *Id.* at 579-80.

Mr. Falconer relies heavily on such comparisons, and has marshaled an impressive array of case law. However, this case law suggests that those cases where motions for new trials on the grounds of inadequate damages have been granted present circumstances more egregious than Mr. Falconer's. Generally, the case law offered by Mr. Falconer is of limited assistance because (1) the award was miserly not only for pain and suffering damages, but also for other forms of compensation; (2) the jury declined to issue any award for pain and suffering; or, (3) state law idiosyncrasies limit the value for purposes of comparison.

The first group of cases consists of those where the award was stingy, not just for pain and suffering, but for other forms of compensation as well. In *Curtiss v. Young Men's Christian Ass'n,* 498 P.2d 330 (Wash. Ct. App. 1972), on which Mr. Falconer principally relies, the plaintiff was a seventeen-year-old paraplegic, who had virtually no control over her bodily functions and was predicted to require surgery every two years. *Id.* at 332-33. Evidence suggested continued deterioration of her legs ending in possible amputation. *Id.* at 333-34. The jury brought back a total award of $100,000 of which $59,860 was earmarked for pain and suffering <u>and</u> impairment of earning capacity and other general damages. *Id.* at 331, 334. The trial court granted a motion for new trial on damages and the Court of Appeals and Supreme Court affirmed.

*Curtiss* offers some support for Mr. Falconer's position, but it also reflects the difficulty comparing damage awards. *Curtiss* was issued thirty-three years ago and, although the legal principles are substantially unchanged, the assessment of the adequacy of damages remains fact-intensive and drawing useful lessons over the decades from different facts in a different court in a different part of the United States is problematic. *See Whitfield v. Melendez-Rivera*, 431 F.3d 1, 16 (1st Cir. 2005)("…although *Gutierrez-Rodriguez* presents the most comparable factual circumstances, it is not particularly helpful as a comparison because it was decided 16 years ago."). *Curtiss* arose from a case tried before a state of Washington jury in Yakima County and Ms. Curtiss was more than two decades younger than Mr. Falconer. She suffered a fracture at T-12, which allowed greater mobility than Mr. Falconer, but generated a plethora of separate medical challenges. Unlike Mr. Falconer's award, the $59,860.00 included "impairment of

earning capacity."[5]  *Curtiss,* 498 P.2d at 335.   Finally, to accurately compare a 1972

award with a 2005 award would require calculations for which there is no record

support.[6]

Mr. Falconer cites numerous cases where <u>nothing</u> was awarded for pain and suffering.

*See Todd v. Bercini,* 92 A.2d 538 (Pa. 1952); *Kerzner v. Global Upholstery Co.,* No. 95-

1209, 1997 U.S. Dist. LEXIS 18457, *2 (E.D. Pa. Nov. 20, 1997); *Kumorek v. Moyers,*

561 N.E.2d 212, 215 (Ill. App. Ct. 1990); *Brooks v. Brattleboro Mem'l Hosp.,* 958 F.2d

525, 526 (2d Cir. 1992); *Davis v. Becker & Assoc., Inc.,* 608 F.2d 621, 622 (5th Cir.

1979); *McKinzie v. Fleming,* 588 F.2d 165, 166 (5th Cir. 1979).[7]  While it may strain

---

[5] *Curtiss* states that the jury awarded $15,140.20 for medical expenses, $25,000.00 for future expenses, and $59,859.80 in "general damages."  *Curtiss,* 498 P.2d at 331.  *Curtiss* does not specify what it means by "general damages," except it says it covers "pain and suffering, restricted future activity with impairment of earning capacity, and the myriad of other ways the plaintiff is affected for the rest of her life for what the trial judge termed an 'horrendous injury.'"  *Id.* at 335.  There is no separate figure in *Curtiss* for pain and suffering as a separate component of damages.  A better comparison between Mr. Falconer's case and *Curtiss* would not be $59,860 and $100,000, but $59,860 and $2,215,668 – the amount Mr. Falconer received for pain and suffering <u>and</u> loss of future earning capacity.  *Jury Verdict.*

[6] Likewise in *Petty v. N.E. Ill. Reg'l Commuter R.R. Corp.,* 799 F. Supp. 848 (N.D. Ill. 1992), the jury awarded a total verdict of $60,000 - an amount only $17,000 more than the Plaintiff's actual out-of-pocket lost earnings – to cover lost past and future earnings, pain and suffering, and disability.  *Id.* at 851.  *See also Protzman v. State,* 458 N.Y.S.2d 408, 409-10 (N.Y. App. Div. 1982)(in two separate cases, one for personal injuries and the other for the wrongful death of a paraplegic's wife: increasing a total damage award of $283,471.35 to $500,000 where stipulated medical expenses were $143,471.35 (first claimant); increasing a total damage award of $100,000 to $305,503 based on testimony that such an amount would be required to cover the cost of a health aide for the remainder of claimant's life (second claimant)); *Andrews v. Karras,* No. 97-3414, 1998 U.S. Dist. LEXIS 17004, *1 (E.D. Pa. Oct. 30, 1998)(injury causing cognitive impairment and chronic back and neck pain awarded $2500 to cover pain and suffering, embarrassment and humiliation, lost enjoyment, past lost earnings and lost earning capacity); *McCoy v. Wean United, Inc.,* No. 3098, 1975 U.S. Dist. LEXIS 13502, *8-*9 (E.D. Tenn. Mar. 6, 1975)(partial hand and wrist amputation, award of $40,000, $5,217.88 of which was to compensate for actual medical costs incurred and the remainder to cover future medical costs and treatment as well as pain and suffering).

[7] In an attachment to his motion, Plaintiff cites additional cases where no damages were awarded for pain and suffering.  *Chart of Inadequate pain and suffering awards* (Docket # 121 – Exh. A).  *See Adam v. J. B. Hunt Transp., Inc.,* 130 F.3d 219, 225 (6th Cir. 1997); *Neison v. Hines,* 653 A.2d 634, 638 (Pa. 1995); *Levesque v. Marine Drilling Co.,* 783 F. Supp. 302, 303-4 (E.D. Tex. 1992); *Pagan v. Shoney's Inc.,* 931 F.2d 334, 337-38 (5th Cir. 1991); *Phav. v. Trueblood, Inc.,* 915 F.2d 764, 765 (1st Cir. 1990); *Boggavarapu v. Ponist,* 542 A.2d 516, 518 (Pa. 1988); *Robertson v. Stanley,* 206 S.E.2d 190, 193 (N.C. 1974); *Brown v. Richard H. Wacholz, Inc.,* 467 F.2d 18 (10th Cir. 1972); *Hatfield v. Seaboard Air Line R.R. Co.,* 396 F.2d 721, 722 (5th Cir. 1968)(nominal damages of one dollar awarded); *Patti v. Hellenic Lines, Ltd.,* 506 F. Supp. 568, 569-70 (S.D.N.Y. 1981)($10,000 damage award regarding which it was "apparent" that it "did not in any way account for…pain and suffering"); *Jehl v. So. Pac. Co.,* 427 P.2d 988, 990-91 (Cal. 1967)(Plaintiff thrown from railroad car, severely injured both legs and requiring partial

reason to conclude that a jury could at the same time find future medical costs yet <u>no</u> future pain and suffering; it is not necessarily inconsistent to award substantial damages for future medical costs and more conservative damages for future pain and suffering.

*Kumorek* is instructive:

> If the jury believed plaintiffs had no compensable pain and suffering, its award of pain-related expenses was wholly unwarranted and contrary to the manifest weight of the evidence. Conversely, if the jury believed their pain was sufficiently serious to warrant extended medical treatment to alleviate such pain and suffering, its failure to award compensation for that pain and suffering means simply the jury disregarded a proven element of damages.... Clearly the jury's verdicts are irreconcilably inconsistent. <u>Had the jury awarded a small amount for pain and suffering in each situation, then the situation might be different.</u> We could then arguably acknowledge that the jury recognized such damages but chose not to believe all of the plaintiffs' testimony. Where we are faced with zero dollar awards when damages are clearly evident, however, we have no choice but to declare that the verdicts are inconsistent.

561 N.E.2d at 215 (citations omitted)(emphasis supplied).

Plaintiff cites some cases which are of limited value due to idiosyncrasies of state law. *Edwards v. Stamford Healthcare Soc'y, Inc.,* 699 N.Y.S.2d 835 (N.Y. App. Div. 1999) is inapposite given that the New York standard of review is whether the award "deviates materially from that which would constitute reasonable compensation". *Id.* at 827.[8] *See Def.'s Objs. to Pl.'s Mot. for a New Trial* at 14 (Docket # 123)(*Def.'s Objs.*). In *Jones v. Wal-Mart Stores, Inc.,* 870 F.2d 982 (5th Cir. 1989), the jury awarded $35,000 in physical pain and mental anguish (but nothing for "future mental anguish")

---

amputation, awarded $100,000 when a reasonable conclusion was that "pecuniary losses alone would exceed the amount of the verdict").

    In other cases, the jury awards were extremely small for pain and suffering. *See Hazelwood v. Beauchamp,* 766 S.W.2d 439 (Ky. Ct. App. 1989)(jury at first refused to award pain and suffering, upon further deliberation, awarded $250); *Hall v. Hall,* 397 S.E.2d 829, 832 (Va. 1990)($48.69 awarded for all non-monetary elements of damage); *Bradner v. Mitchell,* 362 S.E.2d 718, 722 (Va. 1987)($42.65 awarded for pain, mental anguish, humiliation and permanent disfigurement); *Martin v. Payton,* No. 581, 1957 U.S. Dist. LEXIS 4481, *4 (W.D. Ky. Feb. 21, 1957)(award of $5 to cover pain and suffering as well as permanent injury and loss of time).

[8] For this same reason *Keenan* is not on point. *See* 2004 U.S. Dist. LEXIS 17695 at *11-*13.

out of a total award of $106,000 to a plaintiff whose hip was broken when a mobile home fell on it. *Id.* at 984. Under Texas law, "the jury must award something for every element of damage proved". *Id.* at 987. *Jones* relied on this provision when it examined the adequacy only of the specific areas of damages in which the jury returned a take nothing verdict for Plaintiff. *Id.*

There remains, however, a handful of cases more supportive of Plaintiff's case. In *Hammarskjold v. Fountain Powerboats,* 782 F. Supp. 1032 (E.D. Pa. 1992), total damages awarded for a compression fracture consisted of $67,872.88 in medical expenses and $27,127.12 in pain and suffering. *Id.* at 1033. The trial judge, noting that "an award for pain and suffering with respect to obvious serious injuries need not be zero or normal [sic] or a trivialization of the plaintiff's injuries in order to be inadequate", granted a motion for a new trial. *Id.* at 1034 (citing *Hill v. Commonwealth,* 555 A.2d 1362, 1368 (Pa. Commw. Ct. 1989)($5,844 in medical expenses and $1,800 additional damages awarded for an ankle injury deemed inadequate and new trial motion granted)). *See also In re Brooklyn Navy Yard Asbestos Litig.,* 971 F.2d 831, 853 (2d Cir. 1992)($25,000 pain and suffering award for death due to asbestos-related adenocarcinoma shocks the conscience). Generally, these cases and other case law the Plaintiff has cited confirm what this Court already knows: the jury award for Mr. Falconer's pain and suffering was surprisingly low. But, comparative case law is minimally helpful in the "paramount focus" of this Court's analysis, "the evidence presented at trial", *Gutierrez-Rodriguez,* 882 F.2d at 579, and whether the evidence justifies the conclusion that a "clear miscarriage of justice" has taken place. *Phav,* 915 F.2d at 766.

### b. Mr. Falconer

This Court agrees with Mr. Falconer that viewed in isolation, the $100,000.00 pain and suffering award stands at the edge of reasonableness. But, this Court cannot conclude it went over the edge.

First, Mr. Falconer has no quarrel with the jury's award for special damages. Indeed, the jury awarded more generous special damages than Mr. Falconer claimed; he presented evidence supporting a total special damage claim of $3,277,626.00.[9] *Pl.'s Mot.* at 13-14. However, the jury returned an award of $4,962,060.00 for special damages.[10] *Jury Verdict.* Although Mr. Falconer focuses solely on the $100,000.00 award for pain and suffering, his argument that the jury was unduly miserly is undercut by his concession that in other respects, it was overly generous.

Second, the verdict did not include certain amounts Penn Maritime had advanced to Mr. Falconer prior to trial. Penn Maritime paid for land and a new, wheelchair-accessible, mortgage-free home for Mr. Falconer, a wheelchair-accessible van, and home-exercise equipment. Its advance payments totaled $397,098.00 and the jury was instructed it could not consider those payments in assessing damages. Nevertheless, the

---

[9] Past lost wages, lost future earning capacity, and future medical costs.

[10] Plaintiff argues that the closeness between the requested amount for special damages ($3,277,626) and the total amount awarded after the reduction for comparative negligence ($3,290,339) suggests the jury intentionally disregarded the Court's instructions and treated Mr. Falconer's claim as a worker's compensation case, awarding economic damages in full, but only a "nominal" amount for pain and suffering. *Pl.'s Mot.* at 13-14. This Court cannot agree. The two economic damages figures are close, but they are not exact or even approximately exact. Moreover, there does not appear to be any direct correlation between the amounts awarded in each individual category and Plaintiff's requested amounts. Without more, Plaintiff cannot overcome the presumption that the jury followed the Court's instructions. *United States v. Gonzalez-Vazquez,* 219 F.3d 37, 48 (1st Cir. 2000).

jury was aware that Penn Maritime had made substantial pre-trial payments, which benefited Mr. Falconer.[11]

With this said, the evidence at trial was overwhelming that Mr. Falconer has experienced significant pain and suffering and will continue to do so.[12] As in *Smith*, the record "teems with evidence of [his] past and future pain and suffering." *Smith*, 177 F.3d at 30. During Mr. Falconer's stay at Tampa General, he required major surgery, a breathing tube, a tracheotomy, and a Roto-Rest bed, as well as extensive rehabilitative work. After discharge, he had to move to his sister-in-law's house to begin a long recovery, and it was years before he was able to gain the degree of independence he has achieved. Even now, he is often at the mercy of his body. Mr. Falconer plans to undergo surgery for scoliosis, a sequela of his injury. Mr. Falconer's injuries were both physical and psychological. His long-term prognosis is uncertain, but his paralysis is permanent. Mr. Falconer presented a convincing picture of his active and healthy pre-injury lifestyle and of the devastating impact his injury has had on his independence. The evidence also confirmed that Mr. Falconer has handled this life changing injury with courage and has made the best of this tragedy by resolutely living a relatively active life.

In these circumstances, a $100,000.00 award of pain and suffering is conservative almost to a fault. But, this Court cannot conclude that it is outside the "universe of possible awards that are supported by the evidence in this case". *Clark v. Taylor,* 710 F.2d 4, 14 (1st Cir. 1983). First, Mr. Falconer does not appear to be claiming that "there

---

[11] Penn Maritime had also advanced $82,503.00 in past lost wages, but the jury was instructed to deduct this amount from the total past lost wages and it did so. *Jury Verdict.*

[12] Plaintiff describes this evidence in detail in his memorandum. *Pl.'s Mot.* at 2-5, 12-13. He has not, however, supplied the Court with a transcript of the trial. The Court has access to the court reporter's unofficial "Real Time" transcript and has made citations to the Plaintiff's memorandum in the absence of a transcript. The Court (without adopting Plaintiff's more descriptive advocacy) has correlated his factual descriptions generally with what is available.

is some evidence of an improper verdict based on factors other than the amount of the damage award," *Gil-De-Rebollo*, 137 F.3d at 62, and, therefore, this Court's discretion in overturning a verdict is more constrained.[13]  Second, Mr. Falconer is attacking the area of the verdict to which the greatest deference is accorded:  the translation of intangible, non-economic losses into money damages.  *Smith*, 177 F.3d at 30.  Third, the verdict as a whole is admittedly generous regarding special damages, making the claim of jury parsimoniousness less plausible.  Fourth, although there is no direct correlation between pain and suffering and economic loss, the fact that Mr. Falconer has a new, wheelchair-accessible, mortgage-free home, a wheelchair-accessible van, home-exercise equipment, and substantial awards for future medical expenses, past lost wages, and future earning capacity may mitigate some pain and suffering that would have occurred without these resources.[14]  Finally, to the extent that Plaintiff is objecting to the inconsistency of the verdict, such an argument may be waived by failure to object before the jury is dismissed and the opportunity to cure inconsistency is lost.  *See Toucet v. Maritime Overseas Corp.*, 991 F.2d 5, 8 (1st Cir. 1993)(citations omitted).[15]

Mr. Falconer bears an extremely high burden to convince the Court to overturn a jury verdict and, despite the fact it is markedly low, this Court cannot conclude the jury's award for pain and suffering was clearly against the weight of the evidence, shocking to the conscience, or that allowing it to stand would result in a manifest miscarriage of justice.

---

[13] For example, Mr. Falconer made no objection to the damages portion of the Court's jury instructions.

[14] This Court has a duty under the Seventh Amendment to harmonize findings on a special verdict form if at all possible under a fair reading.  *See Toucet v. Maritime Overseas Corp.,*  991 F.2d 5, 8 (1st Cir. 1993)(citations omitted).

[15] The First Circuit has expressed a "substantial reluctance" to consider inconsistency in civil jury verdicts the basis for a new trial.  *See Merchant v. Ruhle,* 740 F.2d 86, 91 (1st Cir. 1984).

IV.     **New Trial on Liability**

a.  **Tampa General Records**

Mr. Falconer requests a new trial on liability, claiming this Court erred in admitting portions of the Tampa Bay General Hospital and Tampa Bay Rehabilitation Center records without proper evidentiary foundation and that the records were "unfairly prejudicial…in so far as they tended to support Defendant's argument that the Plaintiff was faking amnesia in an effort to avoid responsibility". *Pl.'s Mot.* at 19-20.

To place this issue in context, a central point of Penn Maritime's defense was that to enhance his chances of imposing liability on Penn Maritime and to minimize his comparative negligence, Mr. Falconer misrepresented his actual memory of the accident: he was feigning amnesia.  Penn Maritime made much of this contention, raising it prominently in counsel's Opening Statement, repeatedly attacking Mr. and Mrs. Falconer and Mr. Falconer's father on cross-examination about their respective memories, aggressively cross-examining Mr. Falconer's physicians, presenting the countervailing testimony of a neurologist, Dr. Rapoport, on this issue, and making it a major part of the Closing Argument.

 To provide the foundation for this argument, Penn Maritime had to refer to records from Tampa Bay General Hospital and Tampa Bay Rehabilitation Center.  Penn Maritime's expert witness, Dr. Rapoport, formed a view that the nature of Mr. Falconer's head trauma made it unlikely that he had sustained the degree of amnesia he claimed. The hospital records, particularly the Tampa Bay General records, contained details about Mr. Falconer's condition upon admission and his progress, which provided an essential

evidentiary foundation for Dr. Rapoport's opinion testimony and for Penn Maritime's amnesia argument in general.

Whether Tampa Bay hospital records would be admitted arose the fifth day of trial, November 7, 2005.  Mr. Falconer moved the introduction of a limited batch of hospital records[16] and Penn Maritime sought to add another hospital record as an exhibit.  Mr. Falconer objected on foundational grounds.  At this point and throughout the discussion, the parties recited their legacy of distrust, which had led to the taking of the deposition of a medical records custodian in Tampa Bay.  However, when the Tampa Bay medical records custodian was deposed, he did not have a complete set of medical records folders with him and the authentication deposition was not completely successful.[17] Subsequently, efforts by counsel to assure each other of the accuracy and completeness of the medical records failed, and according to Mr. Falconer, the parties realized that any medical records would have to be admitted through a foundational witness.  Mr. Falconer went about laying an appropriate foundation for all the hospital records he wished to admit and complying with the Pretrial Order of the Court by listing the records and witnesses.  Penn Maritime failed to do so.  It neglected to list the Tampa Bay medical records custodian as a witness and this omission left Penn Maritime without a foundational witness for the records essential to its defense.  Penn Maritime urged the Court to consider the records impeachment evidence, which it argued were not subject to the Pretrial Order.

---

[16] The foundation for the admission of these records had been established during the deposition of Dr. Flint, one of Mr. Falconer's treating physicians.
[17] The medical records custodian brought four out of five folders.  It turned out Dr. Flint, one of the treating physicians who had been recently deposed, had the missing folder for purposes of his deposition.

The issue came to a head on November 14, 2005, the ninth day of trial.   In the interim, Penn Maritime obtained a Rule 902(11) certification, authenticating the Tampa Bay records.[18]   The certification generally complied with Rule 902(11); however, the certification was not attached to a specific set of hospital records.  Mr. Falconer objected, noting that the hospital records consisted of 1,600 pages and it would be impossible to verify the accuracy of the Rule 902(11) certification.   The Court ruled against the wholesale admission of the Tampa Bay hospital records.

Penn Maritime tried again, filing a memorandum on November 15, 2005 citing Rule 106.  Rule 106 provides that if a party introduces part of a writing, an adverse party can require consideration of the rest of the document, which "ought in fairness to be considered contemporaneously with it."  Fed. R. Evid. 106.  Penn Maritime argued that the admission of only some of the Tampa Bay medical records gave a misleading impression to the jury.   It focused on an issue involving Dr. Flint, who had testified he was the attending physician.  Penn Maritime sought to admit a portion of the Tampa Bay medical record that stated he was not.  Next, Penn Maritime turned to a limited number of Tampa Bay medical records, which confirmed precisely when it was that Mr. Falconer was admitted to the hospital, his degree of sedation, and level of consciousness.  Penn Maritime's overall point was that there was in fact no real dispute as to the authenticity of the limited number of medical records it wished to admit and their exclusion effectively left it without the ability to proceed with an argument it had made central to its defense.

---

[18] Rule 902(11) provides that a record of a regularly conducted activity under Rule 803(6) can be self authenticating if its custodian makes certain certifications, so long as the party intending to offer the record into evidence gives "written notice of that intention to all adverse parties, and must make the record and declaration available for inspection sufficiently in advance of their offer into evidence to provide an adverse party with a fair opportunity to challenge them." Fed. R. Evid. 902(11).

On November 16, 2005, this Court ruled that select pages of the Tampa Bay medical records were admissible if Mr. Falconer raised no specific concerns as to authenticity or genuineness.[19]  The Court considered the following factors:  (1) the parties had long had possession of the hospital records and were intimately familiar with their contents; (2) the records were what they purported to be; (3) the records would have been admissible under Rule 803(6) if properly authenticated; (4) the records had been certified under Rule 902(11); (5) the advance notice requirement of Rule 902(11) had been substantially satisfied, since the parties had prior possession of the records; (6) to the extent the Plaintiff's inability to check the completeness of the records had been an issue, it was obviated by separate admission of only limited records; (7) the Plaintiff had admitted certain select portions of the hospital record and Rule 106 could call for the admission of additional portions of the same record to avoid unfairness; (8) to exclude select portions of the hospital record would have eviscerated Penn Maritime's amnesia defense, which had been a central focus of its presentation; and, (9) to the extent Mr. Falconer wished to complete the hospital record by admission of other portions of the record, he would be allowed to do so.  This left whether Penn Maritime's failure to comply with the Pretrial Order deserved a sanction.  The Court concluded in light of these circumstances that to sanction Penn Maritime would elevate punctiliousness over fairness.  In the end, Penn Maritime offered a limited number of Tampa General hospital records, such as the ER record, CT scan reports, and a discharge summary.

---

[19] Mr. Falconer made a general objection to the admission of the hospital records on a host of grounds, including authenticity and genuineness; however, the Court informed Plaintiff's counsel that if he contended that any particular record was not what it purported to be, he should bring that concern to the Court's attention separately.  He did not do so.

Finally, Mr. Falconer's claim of prejudice, then and now, is that the records "tended to support Defendant's argument that the Plaintiff was faking amnesia in an effort to avoid responsibility." *Pl.'s Mot. for New Trial* at 19-20. This, however, is not prejudice within the meaning of Rule 403. *Wade v. Haynes*, 663 F.2d 778, 783 (8th Cir. 1981)("...rule 403... does not offer protection against evidence that is merely prejudicial in the sense of being detrimental to a party's case. The rule protects against evidence that is unfairly prejudicial, that is, if it tends to suggest decision on an improper basis.")(citation omitted). The admission of these hospital records does not present grounds for a new trial.

### b. Dr. Rapaport

Mr. Falconer contends he is entitled to a new trial because over his objection the Court allowed Dr. Samuel Rapoport to testify as an expert.[20] Plaintiff's chief quarrel with Dr. Rapoport concerns a change in his testimony. In his Rule 26 report, Dr. Rapoport had opined that Mr. Falconer's retrograde amnesia should have extended a "few hours", but at trial, he limited the time period to "two hours". Mr. Falconer argues there was "no scientifically reliable basis upon which Dr. Rapoport can establish whether or not Mr. Falconer has retrograde amnesia and, if so, for what time period." *Pl.'s Mot.* at 18.

---

[20] Mr. Falconer complains the Court overruled his objection to Dr. Rapoport's testimony "without comment, without a hearing, and without receiving additional scientific support." *Pl.'s Mot.* at 18. In fact, Mr. Falconer filed a motion in limine seeking to exclude Dr. Rapoport's testimony. *Pl.'s Daubert Mot. to Exclude Expert Testimony of Samuel Rapoport, M.D.* (Docket # 13). The Court denied the motion, ruling that his "strenuous objections to the accuracy and reliability of Dr. Rapoport's opinions may be fodder for cross-examination, but are not a sufficient basis to exclude his proposed testimony." *Order on Motions in Limine* at 6 (Docket # 31). Undeterred, he filed a second motion in limine. *Pl.'s Mot. in Limine to Preclude the Defendant from Offering Any Expert Testimony from Dr. Rapoport on the Issue of Memory* (Docket # 41). This Court denied the motion. *Order on Motion in Limine* (Docket # 95). Thus, the Court was familiar with Mr. Falconer's contentions regarding Dr. Rapoport and had overruled them in two written decisions. Both pre-trial and during trial, this Court rejected Mr. Falconer's *Daubert* objections to Dr. Rapoport's testimony for the reasons explained in its written decisions.

Plaintiff correctly anticipates that "this change may appear minor".[21] *Pl.'s Mot.* at 18. However, Plaintiff posits that this difference is significant and was an intentional change, as "the evidence at trial was that Mr. Falconer was awake for two and one half hours prior to his accident.  If in fact his amnesia should be limited to 'two hours' rather than a 'few hours', then, according to Dr. Rapoport, Mr. Falconer should remember some of the events of that morning".  *Id*.

At trial, Plaintiff's counsel thoroughly and exhaustively cross-examined Dr. Rapoport, specifically and repeatedly questioning him about changes between his report and his testimony.  *See Def.'s Objs.* at 18-19; *Pl.'s Mot.* at 19.  Mr. Falconer's counsel was allowed to "explore and expose any weaknesses in the underpinnings of the expert's opinion".  *Newell P.R. v. Rubbermaid, Inc.,* 20 F.3d 15, 21 (1st Cir. 1994), *superseded on other grounds as stated in Klonoski v. Mahlab,* 156 F.3d 255, 269 n.5 (1st Cir. 1998). "When the factual underpinning of an expert opinion is weak, it is a matter affecting the weight and credibility of the testimony – a question to be resolved by the jury".  *Id.*  Dr. Rapoport was eminently qualified to express his expert opinions and Mr. Falconer was entitled to and did probe and challenge the foundation for those opinions.  This Court's decision to allow extensive cross-examination, rather than exclusion, is not a basis for a new trial.

### c.  Curative Instruction

Plaintiff requests a new trial on grounds that Penn Maritime improperly argued facts not in evidence during closing argument, and this Court refused to give a specific curative instruction.  *Pl.'s Mot.* at 16.  Specifically, Plaintiff alleges that defense counsel

---

[21] Indeed, it may not even be contradictory.  A "few" is defined as "consisting of or amounting to a small number", WEBSTER'S THIRD INTERNATIONAL DICTIONARY 843 (3d ed. 2002), and two is a small number.

"argued that the complete Tampa General Medical Records (had they been introduced in entirety) would have established that the Plaintiff did not have retrograde amnesia...[and] further argued that the jury should draw an adverse inference from the fact that Plaintiff objected to the introducing of certain medical records, and did not introduce other medical records". *Id.* at 16-17.  Plaintiff claims prejudice. *Id.* at 17.

At one point, when the Court had excluded the wholesale admission of the Tampa General medical records, defense counsel, referring to his aggressive cross-examination of Mrs. Falconer, threatened to "tell the jury, if the records don't go in, that this is an unprecedented circumstance, and that the reason the pressure and the questioning had to persist was that because the records were to be excluded, that I had to establish that there were important issues of credibility and accuracy of testimony that the records would help the jury assess and then say, believe it or not, these two kept the records out."  The Court warned defense counsel this argument would be improper:  "Well, you're not going to say that, because I kept the records out, and I'm not going to permit you to make that argument."  Defense counsel agreed not to do so.

However, during his Closing Argument, defense counsel argued that Penn Maritime had "tried, of course, to get the complete medical records to show again and again and again and again that Dr. Albrecht was the doctor giving orders not Flint…."  He went on to argue that the reason he had to cross-examine Mrs. Falconer so aggressively was that Mr. Falconer had not offered a complete set of Tampa Bay records and that Mr. Falconer had opposed Penn Maritime's attempts to admit them.  This argument was highly improper.  Mr. Stearns urged the jury to consider evidence that had not been admitted, he

violated this Court's prior admonition that such an argument would be improper, and he reneged on his own representation to the Court that he would not make such an argument.

At the close of the argument, Plaintiff's counsel asked for a curative instruction. She asked that the jury be told that it was not to consider argument based on matters "not in evidence". Plaintiff's co-counsel asked for an additional curative instruction to the effect that Penn Maritime had "the opportunity to introduce any piece of paper he wanted and that they were admitted." The Court agreed to give a curative instruction directing the jury not to consider defense counsel's references to exhibits that were not in evidence.[22] It refused to give an additional instruction as to what exhibits could and could not have been admitted.[23]

Plaintiff argues that the Court's failure to give his additional proposed instruction justifies a new trial. This Court disagrees. The Court's curative instruction was sufficient to limit any prejudice to Plaintiff from Defendant's improper argument.[24] Mr. Stearns more than deserved to have this Court instruct the jury to disregard his unprofessional comments, particularly since he had previously been warned and had violated his own representation to the Court. The Court's intervention at this critical stage in the trial - after his Closing Argument and prior to Rebuttal – weighing in on Mr.

---

[22] "Ladies and gentlemen, I do have an instruction for you regarding something that came up during the course of Mr. Stearns' closing. You may recall that - - you may recall that he made reference to what the Tampa General records that were not introduced might have shown. Now, it is your obligation, as I will instruct you, to base your verdict solely on evidence that has been introduced, not on evidence that hasn't been introduced. You can't speculate about what those records would have revealed, and therefore, you are not to base your verdict on things that are not admitted into evidence, and you are not to accept that portion of Mr. Stearns' argument that asked you to do so."

[23] Of course, Plaintiff's suggested additional instruction would have required the Court and the jury to speculate whether exhibits that were not moved into evidence would have been admitted, if they had been moved – undercutting the admonition not to consider evidence that had not been admitted.

[24] Directly after this controversy, Plaintiff's counsel argued in rebuttal to the jury: "In regards to medical records, there were defendant - - if there was any evidence in the medical records that defendant was faking his memory loss, they would have been introduced by defendant when he introduced through Dr. Rapoport the Tampa General records." This argument was improper for the precisely the same reason Mr. Stearns' was improper. Penn Maritime did not object and this Court gave no additional curative instruction.

Falconer's side with an express instruction to the jury to disregard a portion of defense counsel's argument seemed and still seems an appropriate and measured response.

### d. Mr. Hoffman

Plaintiff argues a new trial should be granted on the issue of contributory negligence because "[o]n the last day of evidence in this case, the Court reversed all of its prior rulings and allowed the Defendant to call Mr. Hoffman to offer Rule 702 expert opinion testimony from Mr. Hoffman relating to Plaintiff's comparative negligence." *Pl.'s Mot.* at 15. This is simply incorrect. As with many issues in this contentious trial, the background for the ruling is convoluted.

Prior to trial, Mr. Falconer moved in limine to preclude Penn Maritime from calling witnesses who had not been properly disclosed as experts. *Pl.'s Mot. in Limine to Preclude the Def. from Offering any F.R.E. 702 Expert Testimony on the Issue of Liability* (Docket # 38). The Court ruled that to the extent Penn Maritime's witnesses had personal knowledge of events, they would be allowed to testify, but not as experts. *Order on Mots. in Limine* at 7-9 (Docket # 94). Mr. Falconer further moved to exclude Louis Hoffman (and others) because Penn Maritime had violated the rules of discovery. *Pl.'s Mot. in Limine to Preclude Def. from Calling Its Employee, Bill Oppenheimer, Louis Hoffman, and Randy Whinery as Witnesses at Trial* (Docket # 39). This Court agreed that Penn Maritime would be precluded from calling Mr. Hoffman during its case in chief. *Order on Mot. in Limine* at 5 (Docket # 95).

These rulings meant precisely what they said. If the Plaintiff had not raised an issue that allowed rebuttal or impeachment by Mr. Hoffman, Penn Maritime would not have

been able to call him as a witness and, in any event, Penn Maritime could not elicit expert testimony from Mr. Hoffman, since he had not been properly designated.

During Plaintiff's opening statement, however, Plaintiff's counsel immediately and forcefully joined as a central issue a question that allowed Penn Maritime to call Mr. Hoffman in rebuttal. Plaintiff's counsel prominently raised the issue of who had the responsibility to assure the safety of the vessel.[25] Mr. Falconer's counsel asserted the evidence would reveal that it was the vessel's captain who had the responsibility to assure that the job of lowering the transition piece through the hatches to the lower engine room was performed safely and that Mr. Falconer was "just doing his job." During Mr. Falconer's direct testimony, a Penn Maritime manual was introduced, which delineated the duties of each job classification, including assistant engineer, and on cross-examination and re-direct, Mr. Falconer clearly asserted and repeated that he was not responsible for the safety of the job on the day he was hurt. During his case-in-chief, Mr. Falconer also called Captain Duplantis and extensively grilled him about the chain of command, his responsibilities as captain, Manuel Carvalheiro's responsibilities as port engineer, and Mr. Falconer's responsibilities as assistant engineer.

To impeach Mr. Falconer's testimony, at the very end of its case, Penn Maritime proposed to call Mr. Hoffman as a witness. Mr. Falconer objected on the ground that it was Penn Maritime, not Mr. Falconer, who brought up the question of responsibility. After reviewing the trial proceedings, the Court concluded that it was Mr. Falconer who initially raised the question. The Court allowed Penn Maritime to call Mr. Hoffman as an

---

[25] Mr. Anderson stated: "As you hear the evidence coming in, I'd ask you to listen and look for certain evidence, such as who was in charge of this operation. We had the company port engineer, the captain of the vessel, and Bruce, who was an assistant engineer. So who's in charge? Who's in authority? Who controls?"

impeachment witness, but limited his testimony to a narrow issue: whether he agreed with Mr. Falconer's testimony that an assistant engineer is not responsible for safety in this type of operation, if the captain and port engineer are present aboard the vessel.

This still left open the question of Penn Maritime's discovery violation. To respond to Penn Maritime's failure to disclose Mr. Hoffman's testimony, the Court allowed Mr. Falconer to perform an in-court, out-of-jury discovery examination of Mr. Hoffman on the issue for which he was being called. Mr. Falconer did so.

Penn Maritime called Mr. Hoffman as a witness. After the factual predicate was established, Mr. Hoffman testified that in performing a job like moving a transition piece from the upper deck to the lower engine room, the senior engineer aboard would have been responsible to see that the job was done safely and to assure that the safety rails were installed around an open hatch.

The parties focused on whether Mr. Hoffman's testimony was impeachment or rebuttal. To characterize his testimony, however, does not resolve the issue, because his testimony was admissible either way. If the testimony was "solely for impeachment", it was not necessary for Penn Maritime to disclose it under Fed. R. Civ. P. 26(a)(1)(A) and he should have been allowed to testify in rebuttal. *See Klonoski*, 156 F.3d at 269-70. On the other hand, if Mr. Hoffman's testimony was a combination of impeachment and substantive testimony, it should have been revealed in discovery. *Id.* This Court previously determined in its pretrial Orders that Penn Maritime violated the rules of discovery and absent Mr. Falconer's joining the issue, the appropriate sanction was to exclude Mr. Hoffman's testimony in accordance with the mandatory provisions of Fed. R. Civ. P. 37(c)(1). *Samos Imex Corp. v. Nextel Commc'ns. Inc.*, 194 F.3d 301, 305 (1st

Cir. 1999)("[E]xclusion of evidence is a standard sanction for a violation of the duty to disclosure under Rule 26(a).").

Once Mr. Falconer raised the issue and Penn Maritime sought to respond, this Court was required to determine whether the sanction of wholesale exclusion remained appropriate. In ruling, it took into account the fact that Mr. Hoffman's testimony could be construed purely as impeachment, since he contradicted Mr. Falconer's testimony on the scope of his responsibility as an assistant engineer. *See Klonoski,* 156 F.3d at 270 (quoting *Chiasson v. Zapata Gulf Marine Corp.,* 988 F.2d 513, 517 (5th Cir. 1993)("Impeachment evidence, on the other hand, is that which is offered to 'discredit a witness… to reduce the effectiveness of [her] testimony by bringing forth evidence which explains why the jury should not put faith in [her] … testimony.'")(alterations in original)(citation omitted)). It also took into account that it was Mr. Falconer who raised the issue in his Opening and during his direct examination.

Although this Court allowed Mr. Hoffman to testify, given Penn Maritime's discovery violation, it allowed Mr. Falconer to engage in discovery prior to his testimony. This alternative mitigated any prejudice to Mr. Falconer from Penn Maritime's discovery violation, yet allowed Penn Maritime to present countervailing testimony to an issue Mr. Falconer himself had raised. In this Court's view, this ruling fell within the Court's discretion to impose "appropriate sanctions" other than exclusion under Rule 37(c)(1).[26]

---

[26] Fed. R. Civ. P. 37(c)(1) provides that:

A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1), or to amend a prior response to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed. In addition to <u>or in lieu of this sanction</u>, the court, on motion and after affording an opportunity to be heard, <u>may impose other appropriate sanctions</u>. In addition to requiring payment of reasonable expenses, including attorney's fees, caused by the failure, these sanctions may include any of the actions

*Ortiz-Lopez v. Sociedad Espanola de Auxilio Mutuo y Benefiencia de Puerto Rico,* 248 F.3d 29, 35 (1st Cir. 2001)(describing Rule 37(c) as granting "wide latitude").   Mr. Falconer now claims he was prejudiced by Mr. Hoffman's testimony, *Pl.'s Mot.* at 15-16, but he did not ask for relief other than wholesale exclusion and specifically did not request the Court for more time to present witnesses on surrebuttal.

To the extent that Plaintiff argues that the Court allowed Mr. Hoffman to testify to his "expert opinion", in contradiction of its earlier Order and beyond the scope of voir dire, this argument is meritless.   This Court's prior Order precluding Penn Maritime from calling Mr. Hoffman as an expert witness expressly denied Plaintiff's motion in limine to the extent that it sought to exclude lay opinion testimony allowed by Rule 701.   *Order on Mots. in Limine* at 9 (Docket # 94); Fed. R. Evid. 701.[27]

Mr. Falconer's attempt to characterize Mr. Hoffman's testimony as "expert opinion" fails.   The amendments to Rule 701 were designed to prevent "proffering an expert in lay witness clothing"; Plaintiff is trying the opposite tactic: to artificially limit the scope of Mr. Hoffman's testimony by dressing a lay witness in expert clothing.   *See* Fed. R. Evid. 701 advisory committee's note.   The line between lay and expert testimony is not always easily drawn, and the same witness may be qualified to provide both.   *United States v. Ayala-Pizarro,* 407 F.3d 25, 28 (1st Cir. 2005).   However, testimony from Mr. Hoffman,

---

authorized under Rule 37(b)(2)(A), (B), and (C) and may include informing the jury of the failure to make the disclosure.
*Id.* (emphasis supplied).
[27] Rule 701 reads as follows:
> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.
*Id.*

a chief engineer, on the responsibilities of an engineer is not expert testimony.  Rather, as

the advisory committee notes continue:

> [M]ost courts have permitted the owner or officer of a business to testify
> to the value or projected profits of the business, without the necessity of
> qualifying the witness as an accountant, appraiser, or similar expert…Such
> opinion testimony is admitted not because of experience, training or
> specialized knowledge within the realm of an expert, but because of the
> particularized knowledge that the witness has by virtue of his or her
> position in the business. The amendment does not purport to change this
> analysis.

Fed. R. Evid. 701 advisory committee's note; *Ayala-Pizarro,* 407 F.3d at 28-29; *Tampa*

*Bay Shipbuilding & Repair Co. v. Cedar Shipping Co.,* 320 F.3d 1213, 1221-23 (11th

Cir. 2003).  Mr. Hoffman's experience in the engineering business allowed him to testify

as to matters within his personal and particularized knowledge:  engineering

responsibilities.  Such knowledge did not establish him an expert.

Mr. Falconer's argument badly misconstrues the Court's earlier Orders and presents

no basis for a new trial.

### e.  Leading Questions

Plaintiff's final ground for a new trial is that this Court erred by allowing the

Defendant's counsel to ask leading questions during direct examination of its witnesses

"while strictly enforcing F.R.E. 611(c) in connection with Plaintiff's direct examination

of his witnesses".  *Pl.'s Mot.* at 20.[28]  This, according to Plaintiff, was part of a "general

---

[28] Rule 611(c) reads as follows:

> Leading questions.  Leading questions should not be used on the direct examination of a
> witness except as may be necessary to develop the witness' testimony. Ordinarily leading
> questions should be permitted on cross-examination. When a party calls a hostile witness,
> an adverse party, or a witness identified with an adverse party, interrogation may be by
> leading questions.

*Id.*

pattern of unfairness at trial". *Id.* Contrary to Plaintiff's counsels' recollection, the trial transcript reveals precisely the opposite.[29]

### V.     Conclusion

Plaintiff's motion for a new trial is DENIED.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 10th day of March, 2006

---

[29] It is true that Mr. Stearns seemed constitutionally incapable of asking a simple question. This frustrated the Court as much as Plaintiff's counsel. Mr. Anderson suggested that Mr. Stearns "knows how to ask a non-leading question." This Court is not at all certain he does. At one point, the Court directed Mr. Stearns not to ask leading questions, defined what a leading question was, and instructed him how to ask a non-leading question. At another point, Penn Maritime's local counsel literally wrote out a non-leading question for Mr. Stearns and Mr. Stearns promptly misread it and asked it in a leading manner. It is nonetheless true that many questions Plaintiff's counsel thought were leading were not. Some were prefatory and others were necessary within Rule 611 to develop the witness' testimony.